THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN GARISTO,                          :
                                          :
                 Plaintiff                :
         v.                               :        1:20-CV-0646
                                          :        (JUDGE MARIANI)
CURT TOPPER, in his official              :
Capacity as Secretary of                  :
Commonwealth of Pennsylvania              :
Department of General Services,           :
JOSEPH M. JACOB, in his official          :
Capacity as Superintendent of             :
Commonwealth of Pennsylvania              :
Bureau of Police and Safety, and          :
RICHARD SCHUR, individually, and in       :
his official capacity as Sergeant with    :
Commonwealth of Pennsylvania              :
Bureau of Police and Safety,              :
                                          :
                 Defendants.              :

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court are cross-motions for summary judgment.  Plaintiff

Stephen Garisto filed a Motion for Summary Judgment (Doc. 31), as did Defendants Curt

Topper, in his official Capacity as Secretary of the Commonwealth of Pennsylvania

Department of General Services, Joseph Jacob, in his official capacity as Superintendent of

the Commonwealth of Pennsylvania Bureau of Police and Safety, and Richard Schur,

individually, and in his official capacity as Sergeant with the Commonwealth of Pennsylvania

Bureau of Police and Safety (Doc. 27).

Plaintiff is a Christian evangelist, and this case concerns his experience sharing his religious message at the Central Pennsylvania Pride Festival (the "Festival") in July 2018 and July 2019.  Plaintiff filed a complaint on April 20, 2020.  (Doc. 1.)  Plaintiff's first cause of action alleges a violation of his freedom of speech under the First Amendment to the United States Constitution, and his second cause of action alleges a violation of due process under the Fourteenth Amendment to the United States Constitution.  (*Id.* at ¶¶ 111–117.)  In his Prayer for Relief, Plaintiff seeks nominal damages and declaratory relief with respect to the alleged violation of his First Amendment and Fourteenth Amendment rights at the 2019 Festival, and permanent injunctive relief with respect to future Festivals.  (*Id.* at 24–25.)[1]  Specifically, the Prayer for Relief seeks the following in pertinent part:

> that this Court enter a permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying policy and practice of banishing protected speech of speakers, including Garisto, from perimeter sidewalks and grassy curtilage of the Grove, including that of Garisto during the annual Pride Festival[.]

(Doc. 1 at 24-25.)

The issues have been fully briefed and all motions are ripe for disposition.

## II. Undisputed Facts

The following facts are undisputed unless otherwise noted.

---

[1] On April 23, 2020, Plaintiff filed a "Motion for Preliminary Injunction" (Doc. 5) ahead of the 2020 Festival, at that time scheduled for July 25, 2020.  (Doc. 6 at 1.)  Plaintiff withdrew the motion upon the cancellation of the 2020 Festival.  (Doc. 20 at 1.)

### A. Background

Plaintiff seeks out public events at which he can share his evangelistic message with others, including the annual Festival in Harrisburg, Pennsylvania.  (Defs.' Statement of Facts, Doc. 30 at ¶¶ 1, 10.)

In July 2018, the Festival was held at Soldier's and Sailor's Grove Memorial Park (the "Grove") in downtown Harrisburg for the first time.  (Pl.'s Statement of Facts, Doc. 33 at ¶ 17.)  It had previously been held at Riverfront Park in Harrisburg, and Plaintiff had attended for many years at that location.  (*Id.* at ¶ 14.)

The Grove is a four-acre park dedicated to Pennsylvania military veterans that sits on the Pennsylvania State Capitol Complex Grounds.  (*Id.* at ¶ 20.)  It is shaped like a quadrangle, bound by North Drive to the north, 7th Street to the east, South Drive to the south, and Commonwealth Avenue to the west.  (*Id.* at ¶ 21.)  The Grove consists mostly of open grassy areas with lines of trees, "intersecting interior sidewalks, paved arcs, lamp posts, flag poles, and benches."  (*Id.* at ¶ 22.)  Sidewalks also line the perimeter of the Grove.  (*Id.* at ¶ 23.)  On the north and south ends of the Grove, the seven-foot wide sidewalks are separated from the street by three feet of grass (the "grassy curtilage").  (*Id.* at ¶ 23.)

The Grove is open to the public year-round.  (*Id.* at ¶ 25.)  It has no gates, fences, or signs otherwise indicating that access to the park is restricted.  (*Id.* at ¶ 26.)  Aside from typical use as a public park, the Grove serves as a venue for permitted public events, as

managed by the Pennsylvania Department of General Services ("DGS").  (*Id.* at ¶ 28.)  Title

4, Chapter 86 of the Pennsylvania Code sets forth DGS's policies and procedures

concerning the use of the public areas of the Capitol Complex.  4 Pa. Code. § 86.1 *et seq.*

> Chapter 86 provides, in pertinent part,
>
> The public areas of the Capitol Complex must be maintained as intact, attractive, safe and readily available to the thousands of individuals who visit and work there.  The Capitol Complex also must be available to individuals who wish to exercise their constitutional rights to assemble and to communicate their views to government officials and the public.

4 Pa. Code § 86.1(b).  Further, the Code clarifies that "[a]t no time will the application or

administration of these policies and procedures be influenced or affected by considerations

of age, sex, race, national origin, handicap, religion, partisan politics *or the content of any*

*written or oral communication or other expressive activity.*"  *Id.* § 86.1(c) (emphasis added).

Finally, with respect to protesters, the Code states, in pertinent part,

> *Demonstrations and leafleting.* Picketing, demonstrations and the distribution of literature may not impede or interfere with Commonwealth business or public access to and use of the buildings within the Capitol Complex. To inform individuals and organizations of the procedures for the use of public areas of the buildings within the Capitol Complex and grounds, it is recommended, but not required, that individuals and organizations desiring to distribute literature on the Capitol Complex grounds inform the Secretary of the date and time of the planned activity. To ensure the unimpeded conduct of public business, unobstructed access to the buildings within the Capitol Complex for occupants and the public, and to maintain the Capitol grounds, *the Secretary may designate specific areas of the grounds for picketing and the distribution of literature. The Secretary's criteria for making designations will apply equally to all activities regardless of the content of any communications.*

4 Pa. Code § 86.5 (emphasis added).

### B. 2018 Festival

Organizers of the Festival, led by Bradley Martin, obtained a permit from DGS to hold their event in the Grove on July 28, 2018. (Doc. 33 at ¶ 36; Doc. 31-16, Ex. P.) The boundaries of the permit are not specifically delineated; the permit simply lists the Grove as the relevant facility for the event. (Doc. 31-16, Ex. P.) The permit is silent as to whether it is an exclusive permit. (*See id.*)

Festival activities, including vendors, were generally confined within the "curb to curb" area of the Grove, but "a stage, food trucks, blockades, generators, and supplies" sat outside the "curb to curb" area. (Doc. 30 at ¶¶ 8, 9.) The Grove was not gated or fenced for the event, nor did the event require an admission fee or ticket for entry. (Doc. 33 at ¶ 37.) Attendees could enter from virtually any spot on the periphery of the Grove. (*Id.* at ¶ 38.)

Plaintiff attended the Festival at the Grove in 2018, as he had for many years at Riverfront Park. (*Id.* at ¶¶ 14, 45.) When Plaintiff arrived with some friends, they positioned themselves on the perimeter sidewalk on the south side of the Grove and began "hand[ing] out literature and convers[ing] with individuals as they passed by" and walked into the event. (*Id.* at ¶ 50.) Plaintiff also used a sound amplification device, held a sign, and wore a shirt with an expressive message. (*See* Docs. 29-1, 29-2, 29-3, Exs. A–C.)

At some point, Plaintiff and his friends were approached by Defendant Richard Schur, Administrative Sergeant with the Capitol Police, who was working the event as supervisor of the Capitol Police security. (Doc. 33 at ¶ 41.) Sgt. Schur directed Plaintiff and

his group to move off of the perimeter sidewalk and onto the adjacent grassy curtilage between the sidewalk and South Drive. (*Id.* at ¶ 55.) Sgt. Schur advised them that "Capitol Police were keeping them to a small area in the grassy curtilage at the request of [Festival] organizers, who had a permit for use of the Grove that day." (*Id.* at ¶ 57.)

Plaintiff thereafter moved to the grassy curtilage and "continued with his evangelistic message to attendees." (*Id.* at ¶ 59.) Private security associated with the Pride Festival and carrying rainbow umbrellas stood nearby Plaintiff and his friends. (*Id.* at ¶ 60.)

Plaintiff left the designated area in the grassy curtilage (the "protest area") at several points during the event. At one point, Plaintiff walked along the grassy curtilage adjacent to South Drive and passed an RV that was parked on the street parallel to the sidewalk. (Doc. 30 at ¶ 13.) The RV was associated with the Festival and was being used to conduct medical screenings for Festival attendees. (*See id.*) Citing Sgt. Schur's deposition testimony, Defendants state that Plaintiff was "stand[ing] in front of the door of the RV . . . in an attempt to engage people." (*Id.* (citing Schur Dep. Tr. at 20:14–21:2, Doc. 29-8, Ex. H).) Sgt. Schur testified that he "was advised that people were afraid to go in [to the RV] because [Plaintiff] was standing in front of the door." (Schur Dep. Tr. at 21:3–4.) Plaintiff "denies he stood in front of the door of the RV," but admits that

> he walked east from where he was standing for approximately 15 to 20 feet and traversed over a crosswalk to another patch of grassy curtilage and toward the eastern end of the Grove, and just started speaking before he was stopped by Capitol Police officer Sgt. Schur. In so doing, he walked by a[n] RV in a continuous motion. He also admits that someone parked a[n] RV on South

Drive by the crosswalk where he was evangelizing at some point after he was moved to that spot.

(Pl.'s Resp. to Defs.' Statement of Facts, Doc. 40 at ¶ 13.)  Sgt. Schur directed Plaintiff to return to the protest area and clarified that he was not to leave the area west of the crosswalk, and Plaintiff so returned.  (Doc. 30 at ¶ 15; Doc. 40 at ¶ 15.)

Sgt. Schur testified that he was notified at another point that Plaintiff had left the protest area and was "walking through the festival" and "handing out pamphlets."  (Schur. Dep. Tr. at 22:21–24:6.)  When asked if he ever left the "grassy area between the curb and the sidewalk," Plaintiff said yes, and testified that he "left that area to go evangelize in other areas."  (Garisto Dep. Tr. at 25:18–23.)   He explained, "Instead of everybody being concentrated in one area, I wanted to spread out to get to some of the other areas. Because the people are coming in from all directions.  So we wanted to try to reach them where they're coming in."  (*Id.* at 25:25–26:4.)  He admits that "he was told he could not go to the west side of the Grove" and states that he complied with Sgt. Schur's direction to return to the grassy curtilage.  (Doc. 40 at ¶ 24.)

Throughout the day, including while standing at the protest area, Plaintiff and his friends were able to interact and converse with Festival attendees.  The video evidence shows that Plaintiff and his friends referred to Festival attendees as, among other things, "sexual deviants" (Doc. 29, Ex. B-17, video file MOV005-h264 @ 0:50), "deceivers of the devil" (*id.* at 7:00), "walking AIDS" (Doc. 29, Ex. C-1 at 6:45), and as attempting to "pervert the next generation" (Doc. 29, Ex. B-8 at 1:40).  At times, these comments were made

pursuant to one-on-one or small group conversations with attendees; other times, they were directed to the crowd generally using a sound amplification device.  (*See generally* Docs. 29-1, 29-2, 29-3, Exs. A–C.)

The parties agree that some of the interactions between the groups "grew loud." (Doc. 30 at ¶ 17; Doc. 40 at ¶ 17.)  Sgt. Schur "intervene[d] on more than one occasion to prevent the situation from escalating into a physical altercation between the two groups." (Doc. 30 at ¶ 17.)  According to Sgt. Schur's testimony, it was the Festival attendees who were being loud and using profanities, not Plaintiff, and it did not appear as though Plaintiff was "going to physically attack someone." (Schur Dep. Tr. at 25:19–26:12.)  Sgt. Schur accordingly "had [the Festival attendees] move on their way." (*Id.*)  Plaintiff denies that "any situation escalated toward a physical altercation." (Doc. 40 at ¶ 17.)

### C. 2019 Festival

The Festival was held at the Grove again the following year, on July 27, 2019.  (Doc. 33 at ¶ 76.)  The Festival organizers obtained another permit for use of the Grove, nearly identical in substance to their 2018 permit.  (Doc. 31-17, Ex. Q.)  Prior to the event, Sgt. Schur learned he would be supervising again.  (Doc. 33 at ¶ 71.)  Sgt. Schur testified that he had conversations with his deputy chief and with Mr. Martin about his plans for the event, though he does not recall with whom he spoke first.  (Schur. Dep. Tr. at 28:3–25, 30:16–19.)

Sgt. Schur testified that "a couple weeks before the event," he and his deputy chief discussed "where [Sgt. Schur] thought would have been a good idea for a protest area on

8

the south side of South Drive." (*Id.* at 28:3–9.)  His deputy chief agreed it was a good idea.

(*Id.* at 28:11–15.)  Sgt. Schur testified that the rationale for this decision was based on the

2018 event:

> Basically because of, you know, him not coming off the—that property, off . . .
> the grassy area where he was allotted and the times we had to get him back to
> the—back to his protest area, and then the confrontations that looked like they
> could get physical, we thought—I thought it was the—within the best interest
> for anybody's safety, including Mr. Garisto's, to move him up across to the other
> side of the street.

(*Id.* at 29:12–20.)  When asked "why [he] didn't believe that [he] could just remind Mr. Garisto,

hey, you have to stay in this area," Sgt. Schur explained,

> I had told Mr. Garisto in 2018 what his area was and had to tell him at least two
> times after that what his—where he needed to be for his protest group and he
> didn't listen those two times, so I didn't think in 2019 that much was going to
> change.

(*Id.* at 29:23–30:5).

Sgt. Schur testified that he also spoke with Mr. Martin prior to the 2019 Festival and

shared what his "plan was for that day.  If they were to show, that we were going to move

them over to the south side of the street." (*Id.* at 28:22–29:7.)  When asked to "elaborate on

how that decision was made," Sgt. Schur testified, "I took a recommendation from Mr.

Martin and based on his recommendation, I made the decision of where the protest group

was going to ultimately be set up." (*Id.* at 65:8–17.)

Plaintiff did attend the Festival again on July 27, 2019.  (Doc. 33 at ¶ 76.)  When he

arrived with friends, their vehicle remained stopped in the street adjacent to the 2018 protest

area and blocked traffic; the parties dispute whether it was "parked" in the road or "temporarily stopped" for passengers to unload and exit. (Doc. 40 at ¶ 28.) Sgt. Schur directed the driver to move the vehicle. (Doc. 30 at ¶ 29.)

Plaintiff and his friends then proceeded to the location of the 2018 protest area on the grassy curtilage. (Doc. 33 at ¶ 84.) Sgt. Schur approached and informed them that this year's designated protest area would be on the sidewalk on the south side of South Drive, across the street from the 2018 protest area. (Id.) Sgt. Schur explained that the Festival organizers "had a permit for the Grove covering curb to curb." (Id. at ¶ 86.) Plaintiff's friend, still standing in the grassy curtilage, "insisted on knowing the law behind the directive," and Sgt. Schur told them, "Right now, you're trespassing . . . because you're on the permit-holder's space." (Doc. 31-24, Ex. X at 0:13.) Sgt. Schur believed the Festival organizers had a right to determine who could be in the Grove during the event. (Doc. 33 at ¶ 87.)

Plaintiff then moved to the other side of South Drive, the width of which is about thirty-six feet. (Id. at ¶ 97.) Cars were parked on both sides of the street. (Id. at ¶ 98.) They protested from there. Someone in Plaintiff's group brought a ladder, which Plaintiff used at points to share his message. (Doc. 40 at ¶ 32.) He also held signs, wore an expressive shirt, brought pamphlets to distribute, and used a sound amplification device. (Id., Doc. 30 at ¶ 32; Schur Dep. Tr. at 36:8–11; Garisto Dep. Tr. at 5–11.)

Plaintiff avers in his Statement of Facts that Sgt. Schur required his group to stand in an area "next to a couple of garbage dumpsters" that were across the street. (Doc. 33 at ¶

93.)  But when asked at his deposition if he was "ever told that [he was] not permitted to travel the perimeter of the festival," or in other words, whether he was told he could not protest from areas across the street other than directly next to the dumpsters, Plaintiff said no.  (Garisto Dep. Tr. at 67:19–21.)

Plaintiff testified that from across the street, Festival attendees could only see and hear him "to a degree."  (*Id.* at 44:18–20, 45:2–5.)  He testified, however, that he had "more interactions in 2019" with Festival attendees than in 2018.  (*Id.* at 54:5–17.)

At one point, Plaintiff "walked toward an area west of the west end of the Grove, in a closed-off portion of Commonwealth Avenue, where food trucks were set up."  (Doc. 33 at ¶ 101.)  He testified that he wanted to "proselytize by the water fountain."  (Garisto Dep. Tr. at 66:13–23.)  Plaintiff avers that Sgt. Schur intercepted him there and threatened to arrest him for leaving the protest area.  (Doc. 33 at ¶ 103.)  Defendants deny this "as stated" but note only that Plaintiff testified that he was never told he could not travel the perimeter of the Festival.  (Doc. 38 at ¶ 103.)  The parties agree that Plaintiff was not issued a citation or arrested.  (Doc. 40 at ¶¶ 42, 43.)

Sgt. Schur encountered Plaintiff at several other points.  He had to separate festival attendees from Plaintiff's group due to confrontations like those in 2018.  (Schur Dep. Tr. at

37:3–19.)  Plaintiff also repeatedly found Sgt. Schur to "complain about [things] in the festival that he didn't like."[2]  (*Id.* at 37:20–38:25.)

### D. Post-2019 Developments

Following the 2019 Festival, Plaintiff filed a personnel complaint with the Capitol Police against Sgt. Schur.  (Doc. 33 at ¶ 106.)  After the Capitol Police concluded that the complaint was "unfounded," Plaintiff's counsel sent a letter to DGS and Defendant Jacob "seeking relief from the restrictions imposed on Garisto's speech during the Pride Fest[ival]."  (*Id.* at ¶ 110.)  Counsel for DGS responded, stating, "We strongly believe that our policies, procedures, and practices with respect to events held on our grounds are legally sound and compliant, and that they were applied properly to the 2019 event and Mr. Garisto and his group, and will be at any future events."  (Doc. 31-14, Ex. N at 2.)  Counsel for DGS noted specifically:

- The Gay Pride Festival was granted a permit for the exclusive use of Soldiers' and Sailors' Grove for July 27, 2019, in accordance with established procedures.
- Neither Mr. Garisto nor his group applied for a permit for Soldiers Grove for that date.
- A designated "protest" area adjacent to the permitted area was created in which other individuals and groups could express their First Amendment rights without interfering with the Festival as the sole permitted event for that date, time and place.

---

[2] Plaintiff objected to the Festival allegedly selling porn and alcohol, and complained about women with bare breasts.  (Doc. 30 at ¶ 37.)  "Sgt. Schur investigated all of Plaintiff's complaints and determined that porn was not being sold, the Festival had obtained a permit to sell alcohol and had an area fenced off for alcohol consumption, and the women Plaintiff complained of had covered nipples and were not in violation of any state or local law."  (*Id.* at ¶ 38.)

- Festival event coordinators indicated to the Capitol Police that Mr. Garisto and others in his group were not permitted to be in their event.
- Mr. Garisto and his group were advised of the event coordinators' wishes, instructed on the established borders for the permitted event, and allowed to utilize the pre-designated protest area to express their views without restriction; they were allowed to use bullhorns and stand on ladders while in the protest area and no arrests were made.

(*Id.* at 1.)  Counsel for DGS concluded, "It was the Festival event coordinators who excluded Mr. Garisto and his group from the event in order to conduct the Festival for the time and purpose of their granted permit."  (*Id.* at 2.)

Plaintiff indicates a desire to attend future Festivals.  (*See* Doc. 33 at ¶ 117; Letter from Pl.'s Counsel dated March 8, 2023, Doc. 45.)

### III. STANDARD OF REVIEW

Summary judgment is appropriate "only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot product admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied,* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable juror could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence."  *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary. Courts may consider video evidence in determining whether disputes of material fact exist. *See Scott*, 550 U.S. at 379–81.

A district court "should consider cross-motions for summary judgment separately and apply the burden of production to each motion."[3]  *Beenick v. LeFebvre*, 684 F. App'x 200,

---

[3] *Beenick* further explains,

[the plaintiff] argues that the District Court failed to apply the correct standard on cross-motions for summary judgment because it did not fully consider his motion for partial summary judgment. Beenick is correct that a District Court should consider cross-motions

205 (3d Cir. 2017) (not precedential) (citing *Lawrence*, 527 F.3d at 310).  "If upon review of

cross motions for summary judgment [the court] find[s] no genuine dispute over material

facts, then [the court] will order judgment to be entered in favor of the party deserving

judgment in light of the law and undisputed facts." *Iberia Foods Corp. v. Romeo*, 150 F.3d

298, 302 (3d Cir. 1998) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d

139, 145–46 (3d Cir. 1998)).

## IV. ANALYSIS

### A. Plaintiff's Motion for Summary Judgment

#### 1. First Amendment: Free Speech

Plaintiff first claims Defendants violated his First Amendment right to free speech by

"prevent[ing] [him] from expressing his religious views on the outskirts of a public park

during a public event."  (Pl.'s Br. in Support, Doc. 32 at 8.)  The Court understands his

challenge as being focused on the 2019 police directive that he move from the grassy

curtilage to the other side of the street.  In essence, Plaintiff attacks the Pennsylvania code

---

for summary judgment separately and apply the appropriate burden of production to each
motion. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The District
Court did not violate this rule because it did not consider the cross-motions simultaneously.
Rather, it addressed Defendants' motion for summary judgment first. By proceeding with
Defendants' motion first, the District Court viewed the evidence in the light most favorable
to Beenick and concluded that Defendants were entitled to summary judgment on all of his
claims. That conclusion ended the case and mooted any need to consider Beenick's cross-
motion for partial summary judgment.

*Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017).

provisions governing use of the Capitol Complex as the Capitol Police applied them to him in 2019.  He does not bring a facial challenge.  (*See* Doc. 39 at 11 n.5.)

Whether the 2019 police directive that Plaintiff move across the street was a constitutional restriction of Plaintiff's speech depends on: "(1) whether the speech is 'protected by the First Amendment'; (2) 'the nature of the forum'; and (3) whether the government's 'justifications for exclusion from the relevant forum satisfy the requisite standard.'"  *Startzell v. City of Phila., Pa.*, 533 F.3d 183, 192 (3d Cir. 2008) (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)).

The first two questions are more easily resolved.  With respect to whether Plaintiff's speech was protected by the First Amendment, Defendants argue that some of his speech was, and some was not.  Defendants contend that some of Plaintiff's speech falls within the ambit of "fighting words."  Fighting words are not protected by the First Amendment and are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."  *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942).  But the doctrine is "extremely narrow," *Johnson v. Campbell*, 332 F.3d 199, 212 (3d Cir. 2003), and "derogatory language generically directed to [a] crowd" and "not personally directed at a particular member of the audience[] is not likely to incite an immediate breach of the peace." *Gilles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005).  To lose the protections of the First Amendment, speech "must do more than bother the listener; [it] must be nothing less than

'an invitation to exchange fisticuffs.'" *Boyle v. Evanchick*, No. CV 19-3270, 2020 WL 1330712, at *6 (E.D. Pa. Mar. 19, 2020) (quoting *Johnson*, 332 F.3d at 212).

Defendants generally state that "the video shows heated arguments between the groups" and specifically cite two interactions that purportedly fit this category: one wherein Plaintiff "engaged in an argument with Festival participants saying 'you are a sexual deviant'" and another wherein he "told a woman he wouldn't listen to her because she was a 'deceiver of [the Devil].'"[4]  (Doc. 34 at 5.)  The video evidence of both interactions depicts passionate conversations between Plaintiff and Festival attendees, discussing sensitive and sometimes explicit topics but engaging with each other in a civilized manner.  Considering the language and the circumstances in which it was used, the speech Defendants identify is "unpleasant but petty, and not sufficiently provocative to constitute fighting words." *Gilles*, 427 F.3d at 205.[5]

Defendants also present the troubling argument that "[a]ny speech by Garisto that was untrue is not protected." (*Id.* at 4.)  They list many examples of allegedly "untrue" and

---

[4] The quote is altered because Defendants' brief inaccurately quotes the video evidence.

[5] As it is Defendants' burden to prove the constitutionality of any restrictions on speech, and accordingly to prove that Plaintiff's speech is unprotected, the Court considers only whether the specific language identified in Defendants' summary judgment brief as speech that "would tend to incite violence" is properly classified as such. (*See* Doc. 34 at 5.)  In their opposition brief, Defendants list a number of categories of speech that are not protected by the First Amendment, and then broadly allege that a number of phrases Plaintiff used "fall into these categories" of unprotected speech.  (Doc. 37 at 6.)  Absent legal argument by Defendants, the Court declines to evaluate whether each phrase satisfies the elements of each of the listed unprotected categories.

therefore unprotected speech, but cite no law in support.[6]  This is a plainly inaccurate

statement of First Amendment law.  And to the extent Defendants suggest that Plaintiff's

speech was unprotected because it conveyed ideas that were not provably "untrue" but

rather offensive, the law is decidedly the opposite.  *See Texas v. Johnson,* 491 U.S. 397,

414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) ("If there is a bedrock principle underlying

the First Amendment, it is that the government may not prohibit the expression of an idea

simply because society finds the idea itself offensive or disagreeable.")  Defendants have

identified no speech that is unprotected by the First Amendment.

In any event, Defendants concede that some of Plaintiff's speech is protected by the

First Amendment.  (*See* Doc. 34 at 5–6 (acknowledging that Plaintiff's "speech that [was]

merely preaching regarding the gospel tracks [sic] and the Bible may be protected speech"

and "[t]herefore, for purposes of summary judgment only, Defendants agree that *some* of

Garisto's speech is protected by the First Amendment[.]") (emphasis in original).)  The Court

therefore treats Plaintiff's speech as protected.

The second question is the nature of the forum.  The parties agree, as does the

Court, that the Grove is a public forum.  A public forum is property that "has been

traditionally open to the public for expressive activity, such as public streets and parks."

---

[6] Defendants later cite *Bolger v. Youngs Drug Products Corp.* for the proposition that Defendants may regulate speech that is "false, deceptive, misleading, and inflammatory."  (Doc. 34 at 5 (citing 463 U.S. 60, 65, 103 S. Ct. 2875, 2879, 77 L. Ed. 2d 469 (1983)).  But *Bolger* is inapposite; it is a commercial speech case, and commercial speech is treated differently under the First Amendment because of the "greater potential for deception or confusion in the context of certain advertising messages."  463 U.S. at 65.

*Pomicter v. Luzerne Cnty. Convention Ctr. Auth.*, 939 F.3d 534, 540 (3d Cir. 2019).  In a public forum, "the rights of the state to limit expressive activity are sharply circumscribed." *Id.* (quoting *United States v. Marcavage*, 609 F.3d 264, 279 (3d Cir. 2010)).

The key question is the third: whether Defendants' "justifications for exclusion from the relevant forum satisfy the requisite standard"—specifically, whether Defendants' justifications for directing Plaintiff across the street from the Grove satisfy intermediate or strict scrutiny, whichever applies.  *Startzell*, 533 F.3d at 192 (quoting *Cornelius*, 473 U.S. at 797, 105 S. Ct. 3439).

### a. Content Neutrality

Under the First Amendment, as applied to the states by the Fourteenth Amendment, "[t]he government may not restrict speech because of its 'message, its ideas, its subject matter, or its content.'"  *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 147–48 (3d Cir. 2022) (quoting *United States v. Stevens*, 559 U.S. 460, 468, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010)).  In evaluating the constitutionality of a government's restriction or regulation of speech in a public forum, courts must draw distinctions between content-based and content-neutral regulations.  *Startzell*, 533 F.3d at 193.

A regulation of speech is content based if it "discriminate[s] based on 'the topic discussed or the idea or message expressed.'"  *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 212 L. Ed. 2d 418, 142 S. Ct. 1464, 1474 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015)).  Content-

based regulations are subject to strict scrutiny; they "are presumptively unconstitutional and

may be justified only if the government proves that they are narrowly tailored to serve

compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 135 S. Ct.

2218, 2226, 192 L. Ed. 2d 236 (2015).  Further, the content-based regulation of speech

must be the "least restrictive means" available to serve the compelling interest.  *United

States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827, 120 S. Ct. 1878, 1893, 146 L. Ed. 2d

865 (2000).

　　　A regulation is content-neutral if it is "justified without reference to the content of the

regulated speech."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746,

2753, 105 L. Ed. 2d 661 (1989).  Instead, it regulates "the manner in which expressive

activity occurs."  *See Bruni v. City of Pittsburgh*, 941 F.3d 73, 87 (3d Cir. 2019) (citing

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 759, 114 S. Ct. 2516, 129 L. Ed. 2d

593 (1994)).  Content-neutral restrictions "may permissibly regulate the time, place, or

manner of expression if they are narrowly tailored to serve a significant government interest,

and leave open ample alternative channels of communication."  *Startzell*, 533 F.3d at 193

(citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 62, 103 S. Ct. 948,

74 L. Ed. 2d 794 (1983)).

　　　These determinations involve questions of law and fact.  As the Third Circuit has

explained,

　　　[W]hether a restriction on the time, place, or manner of speech is reasonable
　　　presents a question of law. However, the reasonableness of a restriction

21

involves an underlying factual inquiry. Under *Ward*, the challenged restriction must be (1) content-neutral, (2) narrowly tailored to serve an important governmental interest, and (3) leave open ample alternatives for communication of information. These elements involve subsidiary fact questions that must be submitted to a jury, except where the evidence applicable to a particular element entitles a party to judgment as a matter of law". *See Pouillon v. City of Owosso*, 206 F.3d 711, 717–18 (6th Cir. 2000); *see also Ovadal v. City of Madison*, 416 F.3d 531, 537–38 (7th Cir. 2005); *cf. Colacurcio v. City of Kent*, 163 F.3d 545, 558 (9th Cir. 1998) (Reinhardt, J. dissenting) (concluding that plaintiffs introduced legally sufficient evidence that the challenged restriction was not content-neutral, requiring submission of the issue to a jury).

*McTernan v. City of York, PA*, 564 F.3d 636, 646 (3d Cir. 2009).

The restriction at issue, and the focus of the Court's analysis, is the Capitol Police's directive that Plaintiff relocate across the street from the permitted event in 2019. As a general matter, "[t]he Supreme Court has recognized permitting schemes as a content-neutral means for the government 'to regulate competing uses of public forums.'" *Startzell*, 533 F.3d at 198 (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S. Ct. 2395, 120 L. ed. 2d 101 (1992)). That the "enforcement of a permit system inevitably requires taking cognizance of content" does not render the enforcement content based. *See id.* (quoting *Kroll v. U.S. Capitol Police*, 847 F.2d 899, 903 (D.C. Cir. 1988)); *see also City of Austin*, 142 S. Ct. at 1473 ("This Court's First Amendment precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral.").

A permit does not extinguish the right of non-permit holders "to communicate their message in a public forum," but their "rights are not superior to the First Amendment rights"

of a permit-holder "to effectively convey the message of its event." *Startzell*, 533 F.3d at

198.  As the Third Circuit has explained, "The right of free speech does not encompass the

right to cause disruption, and that is particularly true when those claiming protection of the

First Amendment cause actual disruption of an event covered by a permit." *Id.*  And the

government's interest in "ensuring that a permit-holder can use the permit for the purpose

for which it was obtained . . . necessarily includes the right of police officers to prevent

counter-protestors from disrupting or interfering with the message of the permit-holder." *Id.*

at 198–99.

Defendants argue the police directive was a content-neutral restriction because

"there is no evidence that Schur relocated Garisto to the designated protester area because

he disagreed with the content of his speech." (Defs.' Br. in Support, Doc. 34 at 10.)  Citing

*Startzell*, Defendants contend the police action was "necessary to preserve public safety" in

response to Plaintiff's "*actions* of interfering with Festival activities." (*Id.* (emphasis in

original).)  Defendants also cite *Marcavage v. City of Philadelphia*, *Pennsylvania*, another

Third Circuit case with similar facts.  481 F. App'x 742, 747 (3d Cir. 2012) (not precedential).

They argue that like the plaintiffs in *Marcavage*, "Garisto was permitted to remain on the

grassy area within the perimeter of the curb-to-curb area until his actions proved to be a

public safety issue and that his rhetoric could possibly incite a physical altercation." (Defs.'

Reply Br., Doc. 42 at 11 (citing 481 F. App'x at 747).)

In response, Plaintiff first contends Defendants' argument that Plaintiff interfered with and disrupted the 2018 Festival is not supported by the Record, and that police were merely reacting to Plaintiff's message.[7]  (*See* Pl.'s Br. in Opp., Doc. 39 at 10.)  Second, Plaintiff argues it is "undisputed" that Defendants "maintain a policy giving Pride Fest[ival] organizers, as private permittee of the Grove, the authority to decide who can be on and speak in any area of the Grove during a public event." (*Id.* at 8.)  He argues such policy was enforced in 2019 when Defendants and Festival organizers "jointly determined to put [Plaintiff] away from the park and on the other side of South Drive." (*Id.*)  Plaintiff argues that policy "effectuates a heckler's veto, a restriction that is necessarily premised on content." (*Id.* (citing *Parks v. City of Columbus*, 395 F.3d 643, 654 (6th Cir. 2005)).

Defendants counter that it was Sgt. Schur and the Capitol Police, not the Festival organizers, who determined the protesters would be designated to an area and where that area would be located.  (Doc. 42 at 11–12.)

It is well established that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty.*, 505 U.S. at 134.  The First Amendment does not permit a

---

[7] Plaintiff argues,

The only "action" of Garisto to which State Defendants take issue is the action of him speaking his message. State Defendants offer no evidence indicating Garisto blocked pathways or access to vendors, became so loud attendees could not hear presentations, initiated confrontations with attendees, or engaged in any other kind of disorderly behavior during the 2018 or 2019 Pride Fest events.

(Doc. 39 at 10.)

"heckler's veto," or "an impermissible content-based restriction on speech where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience." *Startzell*, 533 F.3d at 200 (quoting *Brown v. Louisiana*, 383 U.S. 131, 133 n.1, 86 S. Ct. 719, 15 L. Ed. 2d 637 (1966)); *see also Kennedy v. Bremerton Sch. Dist.*, 213 L. Ed. 2d 755, 142 S. Ct. 2407, 2432 n.8 (2022); *see also Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 234 (6th Cir. 2015).

When the government's regulation of speech is attributable to the wishes of private permit-holders, courts have treated such regulations as content-based heckler's vetoes. For example, in *Parks*, the Sixth Circuit found it "difficult to conceive that [a protester's] removal was based on something other than the content of his speech" when he was moved outside of the event area because "the event sponsor did not want him there." 395 F.3d at 654. The court emphasized that the city could not "claim that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public." *Id.* at 652.

In *Deferio v. City of Syracuse*, the Northern District of New York concluded a police directive that a protester move across the street from a permitted event was similarly content based. *See* 306 F. Supp. 3d 492, 512 (N.D.N.Y. 2018), *aff'd*, 770 F. App'x 587 (2d Cir. 2019). The police officer testified that he interpreted the permit as providing the event organizers with the right to exclude protesters from the event, but noted that the permit itself was content-neutral. *Id.* at 509. The court held it was "'irrelevant whether the [permit] is

content-neutral because the officers enforcing it are ordained with broad discretion to

determine, based on listener reaction, that a particular expressive activity' may be banned

from a public forum." *Id.* at 510.

There is obvious tension between the principles that the government *may not*

regulate speech based on listeners' reactions and that the government *may* regulate the

time, place, and manner of speech to maintain peace and order.  As the Sixth Circuit

explained in *Bible Believers*,

> Notably, a heckler's veto effectuated by the police will nearly always be
> susceptible to being reimagined and repackaged as a means for protecting the
> public, or the speaker himself, from actual or impending harm. After all, if the
> audience is sufficiently incensed by the speaker's message and responds
> aggressively or even violently thereto, one method of quelling that response
> would be to cut off the speech and eject the speaker whose words provoked
> the crowd's ire.  Our point here is that before removing the speaker due to
> safety concerns, and thereby permanently cutting off his speech, the police
> must first make bona fide efforts to protect the speaker from the crowd's hostility
> by other, less restrictive means.

805 F.3d at 255.[8]  In any event, a content-neutral goal of "preventing violent confrontations"

can be distinguished from a content-based restriction akin to a heckler's veto, in part

because "[a] regulation that serves purposes unrelated to the content of expression is

deemed neutral, even if it has an incidental effect on some speakers or messages but not

others."  *See Reilly v. City of Harrisburg*, 790 F. App'x 468, 476 (3d Cir. 2019) (not

precedential) (quoting *McCullen*, 573 U.S. at 480 (alteration in original)).

_____

[8] The Court notes that the speaker here was not "permanently cut[] off"; instead, he was directed to
speak from a nearby location.  The principle nonetheless applies.

With these governing principles in mind, Defendants have failed to produce more than a "mere scintilla" of evidence that the 2019 police directive was a content-neutral regulation of speech, whereas Plaintiff points to evidence "on which [a] jury could reasonably find" that the directive was content based.  *See Anderson*, 477 U.S. at 252.

It may be helpful to explain initially why this case is not directly analogous to *Startzell,* in which the Third Circuit upheld a grant of summary judgment to defendants.  533 F.3d at 205.  While *Startzell* seems to present similar facts—police excluded religious protesters from a gay pride event due to their disruption of the permitted event—its dissimilarities with the facts of this case are material and warrant a different outcome.  The differences are two-fold.  First, there was no evidence to indicate the police in *Startzell* acted on, or believed they were entitled to act on, the requests of the permit-holders.  The police had been specifically instructed by the Philadelphia Police Department's legal advisor that "officers assigned to the event . . . were there to protect everyone's First Amendment rights, including those of anti-LGBT protestors, and *were to let the latter into the permitted area despite Philly Pride's requests to the contrary*."  *Startzell,* 533 F.3d at 190 (emphasis added).  One officer "admitted there was 'a potential' for the crowd to get hostile" based on plaintiffs' message, but the officers' testimony largely suggested permissible justifications for their actions: they were acting on their duties to protect "the safety and welfare of everybody concerned" and to ensure access to event activities.  *Id.* at 200.  The Third Circuit therefore

concluded there was "no evidence" that the "City's actions were based on the content of the speech." *Id.*

Second, the undisputed evidence in *Startzell* depicts substantial disruption of the permitted event's activities. The plaintiff-protesters wandered throughout the event itself, at times attracting large groups of people, blocking pathways and access to vendor booths, and at one point, positioning themselves near the event's main stage and "singing loudly, playing instruments, displaying large signs, and using microphones and bullhorns." *Id.* at 191.[9]

Though the law set forth in *Startzell* is instructive, the Record before this Court is different. First, Plaintiff presents evidence that the 2019 directive was a mere ratification of the permit-holder's wishes, and therefore a content-based regulation of speech. Defendants admit that Sgt. Schur "believed the Pride Fest had a right to determine who could be in the Grove during the event." (Defs.' Response to Pl.'s Statement of Facts, Doc. 38 at ¶ 87.) Sgt. Schur stated in his email summary of the 2019 events that "per [his] conversation with the event coordinators, the protestors were no[t] permitted to be in the event." (Doc. 31-25, Ex. Y.) He testified in his deposition that the Grove was "leased or

---

[9] The record in *Marcavage v. City of Philadelphia, Pennsylvania* also depicted more significant disruption than the facts here, although to a lesser degree than in *Startzell,* as the Third Circuit acknowledged. 481 F. App'x at 748 ("While the disruption he caused in *Startzell* may have been greater than here, this is merely a difference of degree. At each event in question Marcavage attracted agitated crowds, and during the Equality Forum one of his associates had a physical encounter with an event participant.").

permitted to this event, this group, and the group had the right to determine who came onto that property for the event." (Schur. Dep. Tr. at 34:19–21.)  He also testified that he spoke with Mr. Martin before the 2019 event to discuss Sgt. Schur's plan for dealing with protesters, and ultimately made a decision consistent with Mr. Martin's recommendation. (*Id.* at 65:8–17.)  When Plaintiff and his friends arrived at the grassy curtilage in 2019, Sgt. Schur accused them of "trespassing" on the permitted space.  (Doc. 31-24, Ex. X at 0:13.) Finally, in its post-hoc justification of the Capitol Police's actions at the 2019 Festival, counsel for DGS emphasized that Festival organizers had "indicated to the Capitol Police that Mr. Garisto and others in his group were not permitted to be in their event" and that "Mr. Garisto and his group were advised of the event coordinators' wishes."  (Doc. 31-14, Ex. N.)

Defendants deny that Sgt. Schur was acting on the Festival organizers' behalf. Notwithstanding his evident belief that the event organizers had the right to control attendance, Sgt. Schur testified that he "took a recommendation from Mr. Martin" but that he made the ultimate decision himself to move Plaintiff across the street, and that he did so based on Plaintiff's conduct in 2018.  (Schur Dep. Tr. at 65:8–17.)

But Defendants have failed to either (1) produce sufficient evidence that Plaintiff's 2018 conduct "disrupt[ed] or interfer[ed] with the message of the permit-holder," *Startzell,* 533 at 198–99, or (2) produce any evidence to dispute that Defendants believed, in 2018 and 2019, that the Festival's permit was a license to exclude protesters entirely.  The evidence of disruption is minimal and appears partially attributable to attendees, not

Plaintiff.  Sgt. Schur testified that Plaintiff blocked attendees' access to the medical RV, and

that attendees were afraid to enter, but the video evidence depicts only that Plaintiff walked

past it.  Plaintiff wandered away from the 2018 protest area and had to be instructed to

return at least twice, (Doc. 40 at ¶ 24), but Defendants offer no evidence that Plaintiff, in

doing so, "disrupt[ed] or interfere[ed] with the message of the permit-holder."  *Startzell,* 533

at 198–99.  And although Sgt. Schur testified that he had to separate Festival attendees

from Plaintiff when exchanges grew "heated," he admits that it was attendees, and not

Plaintiff, who were loud and using profanities.  This evidence could lead no reasonable jury

to find that Defendants were reacting to conduct, when faced with the uncontroverted

evidence that Defendants believed they had the right to exclude protesters at the request of

Festival organizers.

Furthermore, the Court finds it meaningful that at the time of the actual events, the

only rationales provided for any restriction of speech were the permit and its holders'

wishes.  Defendants support their 2018 conduct-based justification chiefly through Sgt.

Schur's self-serving deposition testimony.  The Court need not "end [its] inquiry into whether

there was content-based discrimination" based on a "superficially content-neutral

justification."  *McGlone v. Metro. Gov't of Nashville*, 749 F. App'x 402, 407 (6th Cir. 2018).

The evidence shows that Plaintiff was told *when he arrived in 2018*—before any alleged

"disruption" could have taken place—that "Capitol Police were keeping them to a small area

in the grassy curtilage *at the request of [Festival] organizers*, who had a permit for use of

30

the Grove that day."  (Doc. 33 at ¶ 57 (emphasis added); Doc. 38 ¶ 57 (Defendants'

response).)  When he arrived in 2019, Sgt. Schur accused him of "trespassing . . . because

[he was] on the permit-holder's space."  (Doc. 31-24, Ex. X at 0:13.)  In his email responding

to Plaintiff's personnel complaint following the 2019 Festival, Sgt. Schur wrote,

> As per my conversation with the event coordinators, the protestors were no[t]
> permitted to be in the event. Mr. Garisto and his group were advised of the
> wishes of the event coordinators and provided a designated protest area on
> South Drive in front of the Forum Building that did not impede their 1st
> amendment rights.

(Doc. 31-25, Ex. Y at 1.)  Counsel for DGS reiterated this explanation unequivocally.  (*See*

Doc. 31-14, Ex. N at 1.)  And notably, neither Sgt. Schur's email nor DGS's letter reference

Plaintiff's 2018 conduct in justifying Defendants' 2019 actions.

 In summary, the undisputed facts demonstrate that Defendants did exactly what the

police in *Startzell* were instructed not to do, *see Startzell,* 533 F.3d at 190; Defendants

arbitrarily excluded protesters at the request of event organizers and in doing so, restricted

Plaintiff's speech based on its content.  *See Parks*, 395 F.3d at 654; *Deferio*, 306 F. Supp.

3d at 512.  As such, the Court must determine whether Plaintiff has shown that Defendants

failed to meet their burden to prove the constitutionality of the restriction under strict

scrutiny.  *See Startzell*, 533 F.3d at 201.

 ### *b. Compelling State Interest*

 To justify a presumptively unconstitutional content-based restriction, the government

must "show that the 'regulation is necessary to serve a compelling state interest and that it

is narrowly drawn to achieve that end.'" *Boos v. Barry*, 485 U.S. 312, 321, 108 S. Ct. 1157,

1164, 99 L. Ed. 2d 333 (1988) (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).  Plaintiff is

entitled to summary judgment if he can show there is no genuine dispute of material fact

that: (1) the restriction is *not* necessary to serve a compelling state interest, or (2) the

restriction was *not* narrowly drawn to achieve that interest.  *Perry Educ. Ass'n*, 460 U.S. at

62.

Plaintiff does not argue that Defendants lack a state interest.  (Doc. 41 at 12

("Garisto has no quarrel with the State having an interest in 'public order and safety,'

presuming it exists.").)  Plaintiff does not specify, but the Court assumes arguendo that

Plaintiff accepts Defendants have a *compelling* state interest.  And it is well established that

the government has a compelling interest in maintaining public safety.  *See Reform Am. v.

City of Detroit, Michigan*, 37 F.4th 1138, 1156–57 (6th Cir.), *cert. denied*, 214 L. Ed. 2d 255,

143 S. Ct. 448 (2022).

The Third Circuit has also recognized, at least in the context of intermediate scrutiny,

the government's interest in ensuring "that a permit-holder can use the permit for the

purpose for which it was obtained."  *Marcavage v. City of Philadelphia, Pa.*, 481 F. App'x at

748 (quoting *Startzell*, 533 F.3d at 198).  The Court assumes arguendo that such interest is

also a compelling one.

### b. Narrowly Tailored

While he accepts Defendants' interests, Plaintiff contends the 2019 police directive was not narrowly tailored to serve those interests. To be narrowly tailored under strict scrutiny, the government must show it chose the "least restrictive means" to further its articulated interest. *United States v. Marcavage*, 609 F.3d at 290 (citing *Playboy Ent. Grp., Inc.*, 529 U.S. at 816). There is no question Defendants fail to make this showing.

At the outset, it appears necessary to clarify what Defendants actually did to restrict Plaintiff's speech.[10] Upon their arrival in 2019, Sgt. Schur directed Plaintiff and the other protesters to move from the grassy curtilage on the north side of South Drive to the sidewalk on the south side of South Drive. Plaintiff's 2019 location was about forty feet from his 2018 location, separated by a public street with cars parked on either side. Plaintiff and the other protesters were not restricted from conveying their message in any other manner; they were permitted to use bullhorns, stand on a ladder, hold signs, wear expressive clothing, and distribute literature.

Plaintiff attacks the police directive from several angles. First, Plaintiff argues it "fails to contemplate, much less coordinate, First Amendment activity or any additional uses of the Grove while the Pride Fest is occurring therein," and suggests that some of the perimeter sidewalks and grassy curtilage areas were not being used for the permitted event

---

[10] Plaintiff describes the police's action as "banishment," (*see, e.g.,* Doc. 32 at 7), but the Record plainly does not support this characterization.

(and, the argument presumably follows, Plaintiff could have been directed there instead of across the street).  (Doc. 32 at 14–15.)  Plaintiff argues that "Defendants go beyond festival boundaries and preclude out-of-favor speech in the perimeter areas, engulfing far too much speech in the process."  (*Id.* at 15.)  And Plaintiff contends that "[e]ven if the record substantiated a disruption or interference" in 2018, the 2019 police directive was a "predetermined banishment" and a "prospective ban" that was not narrowly tailored.  (*Id.* at 16.)

Plaintiff's arguments have merit.  To show the restriction was not narrowly tailored, the Court need only list a sampling of the less-restrictive alternatives Defendants could have employed.  For example, Defendants could have barricaded an unused area on the perimeter sidewalk, or on the grassy curtilage, from which Plaintiff could convey his message, thereby putting a barrier between him and the Festival activities and clearly separating him from attendees while maintaining closer physical proximity and burdening his speech to a lesser degree.  Defendants could have allowed Plaintiff to stand on the curtilage in 2019 until his conduct necessitated a move, as in *Startzell* and *Marcavage v. City of Philadelphia, Pennsylvania*, thereby burdening only the speech that succeeded the disruption.  Defendants could have instructed Plaintiff that he was free to travel the entire

perimeter of the festival, thereby allowing him to position himself closer to more attendees without enabling him to disrupt the Festival itself.[11]

Even disregarding these available alternatives, courts have held that "the policy of allowing permittees unfettered discretion to exclude private citizens on any (or no) basis is not narrowly tailored to the [government's] legitimate interest in protecting its permittees' right" to carry out their permitted event. *Gathright v. City of Portland, Or.*, 439 F.3d 573, 577 (9th Cir. 2006). The Ninth Circuit concluded that such a policy precluded the government from satisfying even intermediate scrutiny. *Id.* ("Solely for the purposes of the City's appeal, we accept its proposition that its policy is content neutral.") Defendants do not produce sufficient evidence to dispute that they acted in accordance with the same policy.[12] Accordingly, Defendants have failed to show the restriction was narrowly tailored under

---

[11] That Plaintiff testified he was never told he could not travel the perimeter of the Festival does not mean he was instructed that he could. (*See* Doc. 38 at ¶ 103.) Notably, Plaintiff was intercepted by Sgt. Schur in an area outside the west end of the Grove. *See supra* p. 11.

[12] Nor have Defendants otherwise shown that the means chosen were not "substantially broader than necessary to achieve the government's interest," a necessary showing under intermediate scrutiny. *Ward*, 491 U.S. at 799. To be sure, the Third Circuit noted in *Marcavage v. City of Philadelphia, Pennsylvania* that the government's interest in ensuring that a permit-holder's right to utilize its permit extends beyond "the physical border of the permitted event." 481 F. App'x at 748 (quoting *Startzell*, 533 F.3d at 198). Marcavage, like Plaintiff, was moved a "short distance away from event participants," ranging from fifteen to fifty feet from where he wanted to be. *Id.* at 747. But the officers did not move Marcavage prospectively; they "allowed Marcavage to speak directly to the crowd until they determined the level of the rhetoric might incite a physical altercation." *Id.* Defendants did not do so here. Defendants' means were "substantially broader than necessary" because they gave Plaintiff no opportunity to protest peacefully; they immediately positioned him outside of the event, which was free and open to the public. As set out previously, Plaintiff was instructed upon arrival in 2019 that the protest area outside of the event was limited to the south side of South Drive where the perimeter of the Grove bordered three additional streets with open access on all sides. *See supra* pp. 5, 10.

either strict or intermediate scrutiny, and Defendants cannot meet their burden even if the restriction was content-neutral.

Having established there is no genuine dispute of material fact that Defendants' action was not narrowly tailored to achieve its articulated interest, Plaintiff is entitled to summary judgment with respect to his First Amendment claim.

### 2. Fourteenth Amendment: Vagueness

Plaintiff also seeks summary judgment with respect to his vagueness claim.  Plaintiff alleges that "Defendants' policies and practices, and enforcement thereof, are unconstitutionally vague, failing to provide fair notice of criminal conduct and lacking sufficiently objective standards to confine the discretion of enforcing officials."  (Doc. 1 at ¶ 23.)  Plaintiff argues "[t]his vagueness gives Defendants ample opportunity to enforce the policies in an *ad hoc*, arbitrary, and discriminatory manner." (*Id.*)

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. ed. 2d 222 (1972).  "A law is impermissibly vague 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or 'authorizes . . . arbitrary and discriminatory enforcement.'" *Reilly*, 790 F. App'x at 474 (quoting *Hill v. Colorado,* 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L. ed. 2d 597 (2002)).

Plaintiff does not identify the "policies and practices" he alleges are "unconstitutionally vague" in his Complaint.  Nor does he do so in his summary judgment

filings.  Plaintiff states in his Complaint that the "[u]se of the Grove and other public areas of

the Capitol Complex is governed by Pennsylvania Code Chapter 86" (Doc. 1 ¶ 42), and that

Chapter 86 addresses the scheduling of events in the Capitol Complex and the availability

of the Capitol Complex to individuals who wish to exercise their constitutional rights to

assemble and communicate (*id.* ¶¶ 44-46).  However, Plaintiff does not mention Chapter 86

(4 Pa. Code § 86) or any subsection thereof in the due process section of his supporting

brief or reply brief.  (*See* Doc. 32 at 19-20, Doc. 18 at 14-15.)   In each instance, Plaintiff

devotes approximately one page to his due process claim, stating generally in his

supporting brief that "State Defendants policy fails to provide him with fair notice of doing

anything wrong" (Doc. 32 at 19) and stating generally in his reply brief that he "challenges

State Defendants' policy as unconstitutionally vague, for failing to give him fair notice of

risking criminal sanction for trespassing on public property that is open to anybody at

anytime" (Doc. 41 at 14).[13]

---

[13] Plaintiff provides a marginally more detailed argument in his reply brief than in his supporting brief.  (*Compare* Doc. 32 at 18-19 *with* Doc. 41 at 13-14.) While both are deficient, as a general matter the Court need not consider arguments raised for the first time in a reply brief.  *See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00658, 2021 WL 1740582, at *4 (M.D. Pa. May 3, 2021) ("The purpose of a reply brief is to respond to arguments raised in an opposition brief, not to raise new arguments. . . . a moving party cannot support its motion with a sparse argument, wait for the non-moving party to note the sparseness of the argument, and then respond with a reply brief that sets forth the full argument that should have been made in the original supporting brief.").

In the due process section of his brief in opposition to Defendant's summary judgment motion, Plaintiff mentions Pennsylvania Code Chapter 86 and takes issue with "how State Defendants treat Garisto" with respect to his exclusion from the Grove, but he does not directly challenge Chapter 86 or elucidate with specificity the policy or practice he is challenging.  (Doc. 39 at 20.)  Instead, he states Defendants' "action" of issuing him a trespass warning and directing him to go across the street "or face criminal citation or arrest" violates his due process rights.  (*Id.* at 21.)

Plaintiff's claim fails because he does not specifically identify the law or policy he contends is vague.  Instead, Plaintiff makes general pronouncements about being pushed off the sidewalks onto the grassy curtilage in 2018 (an act undertaken by Sgt. Schur) and being forced to go across the street in 2019 (at the direction of Sgt. Schur).  (*See* Doc. 32 at 19.)  While the Court has found that these actions violated Plaintiff's First Amendment rights, Plaintiff does not provide sufficient fact or argument to make out a Fourteenth Amendment due process claim.  The Court will not attempt to fill in the blanks in Defendant's due process argument or guess the policy Plaintiff purports to challenge.  Put simply, Plaintiff's vagueness claim is too vague.  Plaintiff's general contention that a policy is too vague to be properly enforced does not prevent him from identifying it, even if the policy he may be attempting to challenge is unwritten.  *See, e.g., Faustin v. City & Cnty. of Denver, Colo.*, 423 F.3d 1192, 1201–02 (10th Cir. 2005) (holding city's unwritten policy is not unconstitutionally vague); *Powell v. Ryan*, 855 F.3d 899, 904 (8th Cir. 2017) (concluding the same).  Plaintiff has identified no policy, unwritten or otherwise, and, therefore, he is not entitled to summary judgment on his due process claim.[14]

---

[14] In any event, the Court concludes that the relief Plaintiff is entitled to under his First Amendment claim subsumes any relief he could have been granted under his due process claim.  Presuming his vagueness claim is rooted in Defendants' arbitrary enforcement of the permitting scheme and deference to event organizers' wishes, that concern is addressed by the relief granted *infra*.

## 2. Defendants' Motion for Summary Judgment

For the reasons discussed above, Plaintiff has failed to make out a due process claim.  Therefore, Defendants' motion for summary judgment (Doc. 27) will be granted as to Plaintiff's due process claim.  Also for the reasons discussed above, Defendants' motion will be denied as to Plaintiff's First Amendment claim.

## V. RELIEF

Having prevailed on the merits of his First Amendment claim, Plaintiff has requested nominal damages, declaratory relief, and injunctive relief.  The Court addresses each in turn.

First, "even absent proof of actual injury, nominal damages are to be awarded to recognize violation of a constitutional right." *Alexander v. Riga*, 208 F.3d 419, 429 (3d Cir. 2000).  Plaintiff has requested nominal damages in the amount of $1.00, which is appropriate.  The Court will order that relief.

Plaintiff has also requested declaratory relief.  "A plaintiff may seek a declaratory judgment even when another adequate remedy exists." *See Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F. Supp. 3d 235, 267 (E.D. Pa. 2022).  However, granting such relief is within a district court's discretion, and district courts should "exercise their discretion to decline proceeding with declaratory judgments when they duplicate other claims." *Id.* (citing *Butta v. GEICO Cas. Co.*, 400 F. Supp. 3d 225, 231 (E.D. Pa. 2019)).  Here, the Court finds that declaratory judgment adds no "utility" to the award of nominal damages, *id.*;

both serve to establish that Defendants' actions in 2019 violated Plaintiff's constitutional

right to free speech.  As such, there is no need for declaratory relief, and the Court will not

order it.

Finally, Plaintiff must show he is entitled to a permanent injunction as a matter of

discretion.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164

L.Ed.2d 641 (2006); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157, 130 S. Ct.

2743, 177 L.Ed.2d 461 (2010).  Plaintiff must establish that "(1) [he] has suffered irreparable

injury; (2) there is no adequate remedy at law; (3) the balance of hardships tips in [his]

favor; and (4) granting an injunction would not be against the public interest."  *Ne.*

*Pennsylvania Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442

(3d Cir. 2019) (citing *eBay*, 547 U.S. at 391).

Plaintiff has been irreparably injured by the denial of his right to exercise his

constitutional right to free speech.  There is no adequate remedy at law for such a violation;

to receive full relief, he must be allowed to convey his message at future Festivals,

unburdened by Defendants' arbitrary exclusion of protesters from the permitted event.  As

the Court listed *supra*, there are a number of less-restrictive means that Defendants could

employ to achieve their interests, none of which require substantially more time or

resources on Defendants' part, and accordingly the balance of hardships tips in Plaintiff's

favor.  Finally, "the public interest is not disserved by enforcing the First Amendment's core

protection against [content-based] discrimination." *Id.* at 442.  For these reasons, Plaintiff is

entitled to injunctive relief.

That relief must be limited, however, to account for the fact-sensitive inquiry that

determines the propriety of content-neutral time, place, and manner regulations.  For

example, the Court will not enjoin Defendants from *ever* moving Plaintiff or other speakers

engaged in protected speech across the street from the Grove, because under different

facts, such action could be content neutral and narrowly tailored to maintain public safety

and protect the interests of the permit-holders.

In his Complaint, Plaintiff asked the Court to

[e]nter a preliminary and permanent injunction enjoining Defendants, their
agents, officials, servants, employees, and all persons in active concert or
participation with them, or any of them, from applying policy and practice of
banishing protected speech of speakers, including Garisto, from perimeter
sidewalks and grassy curtilage of the Grove, including that of Garisto during
the annual Pride Festival.

(Doc. 1 at 24–25.)  Considering Plaintiff's request and exercising its discretion to award

appropriate injunctive relief, the Court will order as follows: (1) Defendants shall not prevent

Plaintiff or other speakers engaged in protected speech from protesting on the perimeter

sidewalk and grassy curtilage of the Grove at the annual Pride Festival, or on comparable

perimeter areas of the Festival if it is not held at the Grove, unless and until (2) Plaintiff's

conduct or that of other speakers engaged in protected speech disrupts or interferes with

the Festival in a legally significant manner as recognized within the Third Circuit, or (3) other

significant governmental interests justify moving Plaintiff or other speakers engaged in

protected speech from those areas or otherwise restricting such speech in a content-neutral manner, but (4) under no circumstances shall Defendants' enforcement of the Festival organizers' wishes qualify as a content-neutral basis for restricting Plaintiff's speech or that of other speakers engaged in protected speech.

## VI. CONCLUSION

The Court will grant Plaintiff's Motion for Summary Judgment (Doc. 31) with respect to Plaintiff's first cause of action for violation of free speech, and deny the motion with respect to his second cause of action for violation of due process.   The Court will deny Defendants' Motion for Summary Judgment (Doc. 27) with respect to Plaintiff's first cause of action for violation of free speech, and will grant the motion with respect to Plaintiff's second cause of action for violation of due process.   A separate order follows.

Robert D. Mariani
United States District Judge